OVERTON, J.
 

 This is the second time that this ease has been brought here. On the first occasion it was lodged in this court on an appeal from a judgment sustaining an exception of misjoinder of parties defendant and of causes of action (96 So. 506, 153 La. 653).
 

 The suit is one for defamation of character, and to annul a guarantee given. It is instituted against the Commercial National Bank, E. K. Smith, S. G. Sample, A. J. Peavy, A. J. Ingersoll, P. P. Keith, and Abe Meyer. Smith was president of the bank at the time the cause of action arose herein, and the remaining persons, named as defendants, were members of the bank’s directorate. Plaintiff was, at the time this cause of action arose, a member of the board of directors, and active vice president of the bank. The substance of plaintiff’s petition is correctly and tersely stated in the opinion handed down, when the case was before us, on the exception of misjoinder, and is as follows :
 

 “Plaintiff alleges, in substance, that, whilst he was 'an officer and director, certain loans were made by the bank after being approved by the discount committee, of which he was a member; that said loans resulted in a loss, and that the loss was attempted to be saddled upon him; that the losses in question were investigated by the board of directors of said bank, "and that said board, under date of September 15, 1920, exonerated him in a resolution that day passed to be forwarded to the Comj)troller of the Currency at Washington; that thereafter the six remaining defendants, who were directors and officers of said bank, entered into a fraudulent conspiracy, and as a result of same prepared and sent a letter addressed to the Comptroller of the Currency, in which it was stated that the resolution was er- , roneous, and that plaintiff was responsible for the losses in question; that this letter was delivered to the Comptroller and exhibited to other' parties without plaintiff’s knowledge or consent, with a view of casting reproach upon the plaintiff and bringing the personal reputation of plaintiff into question; that as a result of said letter plaintiff was denied a hearing before the Comptroller of the Currency, and was informed by the said Comptroller that he was morally and legally bound for the losses incurred; that, yielding to the misrepresentations of the defendants, and under pressure brought to bear by the Comptroller, he executed an instrument of guaranty under date
 
 *43
 
 of February 23, 1921, in tbe sum of $70,000; that he is entitled to have said guaranty declared null and void as having been, obtained by fraud und duress, and without consideration, and to have judgment against all the defendants * * * for slander and. defamation as itemized in the petition; and he prays for judgment accordingly.” Bernstein v. Commercial National Bank et al., 96 So. 506, 153 La. 653.
 

 The defenses of the Commercial National Bank are that, if plaintiff was defamed in said letter delivered to the Comptroller, it (the bank) was not a party to the preparation and publication of the same, but that the preparation and publication of the letter was the act of those who signed and delivered it to- the Comptroller, while acting in their individual capacities; that, in the event this defense should be overruled, then that said letter was a privileged communication, delivered in good faith to the Comptroller, for the delivery of which it is not liable in damages ; and, in the event this defense should be overruled, then it pleads that the contents of said, letter are true. The bank also pleads the prescription of one year against plaintiff’s demand for damages. As relates to the demand for the annulment of said guaranty, the bank denies that the guaranty was* given without consideration; denies that it was obtained by means of duress or fraud; and avers that it was freely and voluntarily given by plaintiff, and is, in itself, a compromise of the differences between plaintiff and the bank. The defenses of the remaining defendants, with possibly the exception of Abe Meyer, who, though he answered plaintiff’s demand, later retracted the statements complained of in the letter to the Comptroller, are that the letter to the Comptroller was a communication made in compliance with a duty which they owed, and was therefore privileged, and, in the event the defense of privilege should be overruled, then they plead that the statements in the letter are true. ' These defendants also plead the prescription'. .Of one year against plaintiff’s de'-. maná for damages.
 

 Plaintiff became a member of the board of directors of the Commercial National Bank in 1900, and in the summer of 1915 was elected active first vice president of the institution. At the time of his election to the vice presidency, E. K. Smith, one of the defendants herein, was president of the bank, and had been president since some time in August, 1914. The remaining persons named as defendants were members of the bank’s ■board of directors.
 

 One of the customers of the Commercial National Bank was the Tex-La-Homa Oil Corporation. At times the deposits of this company in the bank exceeded $100,000, though its usual balance w.as anywhere from $30,000 to $2,000. By reason of the connections which the company had it was able to, and did, bring to the bank deposits more valuable than its own.
 

 The Tex-La-Homa Oil Corporation owned and operated the Globe Oil Company. Another concern, the Mohawk Oil Company, sold its holdings to the Tex-La-Homa Oil Corporation, retaining as security for the deferred portion of the purchase price a mortgage and vendor’s privilege on the property sold, and taking in payment of the remainder of the purchase price, or of a large part thereof, stock of its vendee. Plaintiff owned one-fourth of the stock of the Mohawk Oil Company, and E. N. Brown, Jr., the remaining three-fourths. Hence plaintiff was interested through the Mohawk Oil Company in the Tex-La-Homa Oil Corporation.
 

 The Tex-La-PIoma Oil Corporation was organized chiefly through the efforts of G. G. Gillette, who went to Shreveport,' La., from Tulsa, Old., in 1919. The chief assets of the company were large oil properties which it acquired from W. G. Strange, largely on terms of credit, for a price exceeding $3,-000,000. Gillette was actively organizing, or assisting in the organization of, other corporations, among them being the Paramount Petroleum Company. There were associated
 
 *45
 
 with' him, as stockholders in the Tex-LaHoma Oil Corporation, a number oí men of means.
 

 Gillette, on notes signed as maker in some instances by the Tex-La-Homa Oil Corporation, in others by himself, and in still other instances by those associated with him, or upon the note of some corporation, obtained money from the bank. The transactions were carried in the liability ledger of the bank in an account running in the name of G. G. Gillette. An examination of Gillette’s liability sheet shows that the bank advanced on this account, on October 11, 1919, the sum of $12,750 on a note signed by B. R. Farmer; $20,400 on a note signed by O. J. Backwater; and $20,000 on a note signed by J. O. Mitchell and W. II. Walker. These loans or discounts appear to have been approved by Ricks, assistant cashier of the bank. This sheet also shows that there was advanced on this account on October 14, 1919, on three notes, made by the Globe Oil Company, a subsidiary of the Tex-La-Homa Oil Corporation, $30,600, and that, on October 17, 1920, there was loaned on two Globe Oil Company notes $20,404.40. It does not appear who approved the first three of these loans, but the last two appear to have been approved by Kahn, vice president of the bank. This sheet also shows that on October 27, 1919, there was loaned on this account on the note of the Petroleum Properties Corporation the sum of $25,000, and the approval for it appears to have been given by E. K. Smith, the president of the bank. The making of none of these loans was approved by plaintiff, for at the time they were made he was absent from the state. On the other hand, the same sheet shows that plaintiff approved loans, entered in this account, both before and after the foregoing were made, though, with one or two comparatively small exceptions, after-wards. These and other items of a similar nature appearing on this sheet are referred to in the evidence and in some of the correspondence in the record as the Gillette loans.
 

 On December 16, 1919, a part of the indebtedness due by the Tex-La-Homa Oil Cor-' poration on the purchase price of the property acquired by it from the W. G. Strange Oil Company was about to mature; that part amounting to $250,000. Application was made to the Commercial National Bank to lend the company $100,000 to assist in making this payment. The question whether or not the loan should be made came before plaintiff, who called into conference with him A. T. Kahn, one of the vice presidents of the bank, and Ricks, the assistant cashier. This committee approved the loan. The note to be given for it was indorsed by a number of men, apparently of means, who were interested in the maker of the note; In addition to these indorsements it was required that all of that part of the oil transported through the pipe lines of the Standard Oil Company be allocated for the payment of the debt, and this was done.
 

 With reference to the indorsers it may be said that at the time the loan was approved there were on file in the Commercial National Bank .reports showing their estimated worth and their reputation commercially. A report by a prominent commercial agency, on file at the time, showed that the net worth of one of the indorsers on the note was then estimated at approximately $750,000, and thah he enjoyed the reputation of caring for his obligations.. There was also in the bank at the time a letter dated January 3, 1919, addressed to vice president Kahn, from a bank in Tulsa, speaking very highly of the business ability and integrity of this indorser, and reporting him to be a large real estate owner and to be a man of means. The report on this indorser closes with the statement that, in the bank’s opinion, he is good for any contract he might make. There was also in the bank, at the time, another letter from a bank at Tulsa, with reference to this
 
 *47
 
 indorser, substantially to tbe same effect as the preceding letter: With reference to another indorser on the note, who resided in 'Chicago, there was a report on file at the time the loan was approved, made by one of the principal commercial agencies, to the effect'that this indorser was said to be'worth $1,000,000, and was prospective heir to an estate said to be valued in excess of $1,500,-000, and was said to be a man of sound financial judgment. With reference to another indorser on the note, who resided at Tulsa, Okl., there was a report on file, made by one of the commercial agencies, that this indorser was quite favorably known, and claimed to be worth $200,000, though that outsiders placed his worth at about one-half of that. There were also letters, on file at the time, from two banks at Tulsa, addressed to Vice President Kahn, reporting favorably on this indorser, one of these letters advising that he has a number'of-outside investments, is reputed to be quite well to do, and has the confidence and esteem of his business associates, and the other advising that the bank making the report had had business dealings with him, and that these dealings had been satisfactory. There were four other indorsers on the note, but the record is not clear as to what their worth was.
 

 The loan was made and was later approved, together with other loans, by the board of directors. The money loaned Was deposited to the credit of the borrower, the Tex-La-Homa Oil Corporation-, and was at once paid to the W. G. Strange Oil Company, a company in which plaintiff had no interest. Some ‘60 days later another installment fell due on the purchase price of the property acquired from the Strange Oil Company. This installment, amounting to $250,000, was paid; the Commercial National Bank advancing no part of the money with which to make the payment. When this payment was made, the Tex-La-Homa Oil Corporation had paid $1,-000,000 on the purchase price of the property. However, before the next payment on the property fell due, which was some 60 days later, the production of oil from the properties of the Tex-La-Homa Oil Corporation had declined; the price of oil fell; the money market had become stringent; and as a result that company defaulted in its payment, and later failed. There is evidence in the record to the effect that, not long after the failure of the company, the indorsers on the $100,000 note, having indorsed other notes for the corporation that were discounted in other banks, disposed of their property to friends and relatives; thus endangering the collection of the note.
 

 The foregoing loan does not appear to have been criticized by 'the board of directors, at least, in session convened, until May 8, 1920, at which time its collection was doubtful, and the board ordered it, upon the recommendation of a committee, listed, among others, for immediate collection.
 

 In July, 1920, one of the bank examiners, in a report to the Comptroller, said:
 

 “According to the officers and directors,
 
 Vice President Bernstein entered into relations with Gillette and his crowd and their companies took over properties from him at probably exaggerated values, and, after the failure of their enterprise of promotions, it is said that the most valuable of the properties he' put in he has gotten back into his hands.
 

 “Bernstein might be rightfully charged with misapplication of the bank’s funds but for the fact that the loans came into the bank with the sanction of the discount committee, with the exception of the cashier, who claims he opposed them, which claim is admitted by the other officers. Bernstein simply ‘put it by’ the rest of them with their eyes ppen and made them share the responsibility, and now they are keeping him in the hope that he will work out the paper.” (Italics ours.)
 

 A copy of this report reached the bank, and was read at a meeting of the board of directors on August 30, 1920. Plaintiff was not present at that meeting. However, he was present at a meeting of the board on September 14, 1920, at which the minutes of
 
 *49
 
 August BOth were read. The examiner’s report was read again at this meeting, and plaintiff protested against the statements in the report concerning him. At an adjourned meeting of the board held the next day a letter was approved by the board of directors and mailed to the Comptroller, which, in so far as it bears on this ease, is as follows:
 

 “Yours of the 1st in regard to the examination of our books, a report of which has been furnished and read to our board, is having our prompt attention. * * *
 

 “Vice President Bernstein and the other officers are making every effort to collect the amounts due from the Tex-La-Homa Company, although this is being charged off. Our attorney, Mr. Aby, of the firm of Aby & Tucker, Tulsa, Old., hopes to effect a settlement with
 
 the
 
 indorsers, whereby we will experience very little, if any, loss. This loan was made, not on account of any company in which Mr. Bernstein had stock, in making the sale to the Tex-La-Homa Company, but was predicated upon that company’s business with this bank, and from notes secured by the indorsements of men whose ratings justified the same, as the records nowi on file with this bank will show.
 

 “This fact is evidenced from the accommodations which these indorsements received from a number of other banks of the highest character.
 

 “Furthermore, at a meeting of our board on December 17, 1919, their attention was called to these loans, and a committee, composed of Directors Sample, Barrett, and Meyer, reported favorably on them at a meeting held on December 30th, and having no criticism of the Gillette loan.
 

 “The Paramount Petroleum Company is a concern .composed largely of local capital, and Mr. Bernstein has a very small interest therein; This loan was made in due course of business, based on a thorough investigation of the officers and management of the company. Special attention was brought to the loan of the Paramount Company under date of February 14, 1920, when the loan was originally made and approved. The note was held past due, and has not been renewed; the bank holding as collateral $150,000 par value of the mortgage notes of the company.”
 

 Smith, the president of the bank, was present at the meeting of the board on August 30th, when the report of the bank examiner was read, but was in Washington when the foregoing reply was approved by the board and signed by the members thereof who were present. When this reply reached Washington, Smith saw a copy of it, and wrote and sent a letter to the Comptroller, which is quite lengthy, the purpose of which was stated to be to supplement the foregoing reply sent by the board of directors, to the report of the examiner. In this letter Mr. Smith says :
 

 “You ask me regarding the Gillette-Tex-LaHoma loan, and I have this to say: That this matter was handled almost entirely by our Mr. Bernstein, who had sold to Mr. Gillette and associates an oil property in which he was interested, and for which Gillette states he paid Bernstein $500,000 in cash on the property. Afterwards, on account of the low price of oil, which price was cut by the old companies from $1.25 to 60 cents per barrel, and on account of the lessening production of the wells, the company had to give up these properties, known as the Mohawk Oil Company and an interest in the Dixie Oil Company, which interests were returned to Mr. Bernstein and his associates. When the question of loans to Gillette or any of his interests was brought up, there was always a protest from the directors and officers, and, when these loans were finally taken into the bank, it was because of statements made by Bernstein and statements from the commercial agencies, and letters addressed to him regarding the commercial worth of the parties named. The writer was away from the bank a great deal during the year, and the matter was handled almost exclusively by Mr. Bernstein, our cashier, and some of the others opposing each loan as it was made. When the matter was brought before each directors’ meeting, we examined into the loans as carefully as possible, but, while we were suspicious, Mr. Bernstein made satisfactory explanation at each meeting, so there was the hope on our part that, in spite of our intuition, these loans would be paid. At one time, as our records will show, I appointed a committee of Messrs. Sample, Meyer and Barrett to go into the matter thoroughly with Mr. Bernstein and make their report back to the board of directors. They went over the records with Mr. Bernstein, who reported back that, according to reports and statements made by Mr. Bernstein, the loans were all right. However, it must be borne in mind that they were guided by Mr. Bernstein, as they would have been guided
 
 *51
 
 by me or any ranking officer of the bank. Right here I call your attention to this fact: That Mr. Bernstein is a millionaire, a man who has been with the bank since its organization. As a credit man he has always stood very high, and, while our directors were suspicious of these transactions, it did not occur to them that his judgment was not good, nor that any statement he made was not correct. Our minute book will bear me out in the statement above. Mr.' Bernstein, to begin with, acquired an interest in the property which he sold, for practically nothing, from one of the customers of the bank and a man by the name of E. N-Brown. If the statement of Gillette be true, he received for that interest about $500,000', and the Tex-La-IIoma and Gillette expended something over $100,000 in further development of the property. He and Brown took back the property, and I believe Mr. Bernstein made the statement to your Mr. Longmoor that this property was making about 1,200 barrels of oil per day, which, at the present value of oil, would make his property worth an additional $500,000. Mr. Bernstein is entirely responsible for the making of these loans, and where the officers agreed with him about renewal, it was only at his request, with the oft-repeated statements to all of us that they had plenty of assets, that the security was ample and the debts would be paid. * * *
 

 “I cannot quite understand the statement in which our directors join, stating that the ‘loan was not made on account of any company in which Mr. Bernstein had stock in making the sale to the Tex-La-Homa Company,’ nor do I understand that next paragraph in which they state that the committee which I had appointed reported favorably, except as stated above, when their report was made solely on account of the faith they had in the statements which Mr. Bernstein made to them that the loans were all right. * * *
 

 “AYitk further reference to the Gillette-Tex-La-Homa-Bernstein matter, I might add that investigation of the deposits made from these loans will show that the money was expended for the betterment of the Bernstein and other properties when it was borrowed from the bank, and I further believe that further investigation will also show that money for some of these loans was paid to Bernstein and Brown.
 

 “This letter is written for the benefit of your examiner and for your information, and, unless it is necessary, I will appreciate it if you would not let this information go beyond the examiner to the bank, as this information should help them to bring this matter to a showdown when they come before our board.”
 

 This letter was kept secret from plaintiff. He knew nothing of it until shortly before the suit was filed.
 

 The next step of importance taken by the bank or the members of its board of directors in this matter was the preparation of a letter, dated December 14, 1920, addressed to the Comptroller of the Currency. The letter, in so far as it is pertinent to the case, is as follows:
 

 “Your favor of November 27th addressed to this board of directors has been received, and this is the first meeting of our board since the receipt of the letter. * * *
 

 “The Brackenstoek note for $38,000 is now in process of collection.
 

 “AVe believe we are justified in saying that, in pur opinion, we will collect the MacMillan note, amounting to $23,000.
 

 “The same will apply to:
 

 The Gillette and Mitchell note.............. $20,000 00
 

 The Gillette note............................. 16,745 65
 

 The Sutherlin note........................... 20,266 65
 

 “AVe have just succeeded, in getting in our possession from the Continental Bank and Trust Company of this city a signed and sworn statement of John O. Mitchell, of Tulsa, Okl., that he was worth more than $2,000,000. and his assets are all listed and enumerated therer in. Verbal statements similar to this signed statement of his were the basis • of our lending him money. Since that time he has transferred these properties to relatives for the purpose of evading payment of these notes of ours and other indebtedness due the Shreveport banks. Our attorney advises, however, that he will be able to uncover these properties, and it is our - understanding that Mitchell has offered to pay 50 cents on the dollar if we will release him from these obligations.
 

 “Our Mr. Bernstein is at the present time in Tulsa, and, with the statement and other information, we believe we will be enabled to uncover a lot of Gillette’s holdings which may perhaps get for the bank a return for all the money and obligations referred to, as well as the amount of $100,000 which had been charged off.
 

 “If our bank had made $1,000,000, and with no other losses, and we were trying to evade taxation, we would say that we would not be warranted in charging off these amounts under the circumstances. * * * ”
 

 This letter, which refers to various other matters (which we have omitted) as not be
 
 *53
 
 ing pertinent to the case, was evidently written before the meeting of the board was held at which it was approved, for, while the letter mentions the absence of plaintiff, yet he was present at the meeting and signed the letter together with the other members of the board, including those who are named as defendants herein. At the meeting at which this letter was approved a resolution was adopted appointing a committee, to be composed of Messrs. Smith, Ingersoll, Lo,eb, Peavy, Barrett and plaintiff to go to Washington for the purpose of explaining to the Comptroller fully the matters referred to in the letter, and the method of the bank in handling cotton accounts and other loans, and to endeavor to secure the co-operation of the Comptroller and the bank examiners in straightening matters out to the satisfaction of all.
 

 On December 16, 1020, 2 days following the appointment of the foregoing committee, some of the members of the board of directors of the bank secretly wrote a letter to be delivered to the Comptroller. This letter constitutes the basis of plaintiff’s suit for libel, and enters into the remainder of his demand. The first three paragraphs of the letter? following the opening paragraph, were taken verbatim from the board’s letter to the Comptroller, of date September 14,1920, and the purpose of the remaining paragraphs are stated by the signers to be to correct a wrong impression conveyed by the paragraphs first mentioned. The letter in its entirety, including the paragraphs which are quoted in it from the letter of September 14, is as follows:
 

 “We. the undersigned directors of the Commercial (National) Bank of Shreveport, La., wish to correct a misstatement as contained in the directors’ letter to you of September 14, 1920, and as follows:
 

 “■ ‘Vice 'President Bernstein, and the other officers, are making every effort to .collect the amounts due from the Tex-La-Homa Oil Company, although this is being charged off. Our I attorney, Mr. Aby of the firm of Aby & Tucker, Tulsa, Old., hopes to effect a settlement with the indorsers whereby we shall experience very little, if any, loss. This loan was made not on account of any company in which Mr. Bernstein had stock in making the sale to the Tex-La-Homa Company, but was predicated upon that company’s business with the bank, and from notes secured by the indorsements of men whose ratings justified same, as the records now on file with this bank will show. This fact is evidenced from the accommodations which these indorsements received from a number of other banks of the highest character.
 

 “ ‘Furthermore, at a meeting of our board of directors on December 17, 1919, their attention was called to these loans, and a committee, composed of Directors Sample, Barrett, and Meyer, reported favorably on them at a meeting held on December 30th, and having no criticism of the Gillette loan.
 

 “ ‘The Paramount Petroleum Company is a concern composed largely of local capital, and Mr. Bernstein has a very small interest therein. This loan was made without any regard to Mr. Bernstein’s relations to the company, but was made in due course of business, based on a thorough investigation of the officers and management of the company. Special attention was brought to the loan of the Paramount Company under date of February 14, 1920, when tbe loan was originally made and approved. The note was held past due, and has not been renewed, the bank holding' as collateral $150,000 par value of the mortgage notes of the company.’
 

 “And to correct a wrong impression this statement conveyed:
 

 “These loans to Gillette and his companies were made by Mr. Bernstein, and, while the other officers may have concurred, and while the directors approved these loans, it was because of the recommendation of Mr. Bernstein. Our minutes bear testimony to the protest of our officers and directors against these loans, and show that Mr. Bernstein claimed, and is still claiming, that these amounts will be-paid, and has stood sponsor for the loans from the time they were received in the bank. ■
 

 “We have no ratings or statements regarding the indorsers of the notes, except those given us by Mr. Bernstein, and who, even at this date, has all these letters and statements in his private files. The other two banks in this city wdio made loans to 'these interests have stated they v'ere influenced by Mr,. Bernstein to take large amounts of this. paper.
 

 “The next statement regarding, the committee appointed by the president is at variance
 
 *55
 
 with the facts, as the minutes of the meeting and report of the directors on March 8, 1920, as well as the minutes of each meeting held before and after that date, will show conclusively that not only was the loan criticized, but that Mr. Bernstein was asked to see that these loans were collected, as the directors felt that he was responsible for making the loans. At that time, however, we were not fully advised regarding Mr. Bernstein’s connection with these interests.
 

 “In our opinion, Mr. Bernstein has profited by making these loans, and we do not believe that he would have approved of such advances had they been a strictly banking matter, and presented to him through regular business channels, and we believe he was influenced in making them by the interest he had in the sales and purchases of the Gillette properties.
 

 “Mr. Bernstein was part owner and directly interested in the Mohawk Oil Company and the Dixie Oil Company, which property he and his partner, Mr. E. N. Brown, Jr., foreclosed on after payments, amounting to $800,000, had been made, and which they now have in their possession, being all of the Mohawk properties and a working interest in the Dixie. Gillette also purchased, and with Mr. Bernstein’s as-' sistance, the Strange properties in the Bull Bayou territory, and the Globe' Oil Company properties in the Caddo field. They also promoted the Paramount Petroleum Company, and the Shreveport Producing & Refining Company. Mr. Bernstein is president of the Shreveport’Producing & Refining Company and first vice president of the Paramount Petroleum Company.
 

 “•It is our understanding that Mr. Brown has stated to your examiner that, while taking out large sums of money from these negotiations, Mr. Bernstein has never invested one penny in, the properties, and since taking these properties back money has been advanced by this bank amounting to $150,000 to the, Mohawk Oil Company and the Thomas Drilling Company, part of which is indorsed by E. M. Brown, Jr., which makes this paper perfectly good, but does not alter the fact that the bank is putting up all the money for these investments and the building up of .these valuable properties.
 

 “In the next paragraph, we note Mr. Bernstein’s remarks in regard to the Paramount Petroleum Company. ■ Our minute book will show this transaction without further comment. Mr. Bernstein presided at the meeting at which this letter was handed in for our signatures, and it was signed by the directors without our knowledge that it contained the paragraphs referred to herein.
 

 “In our opinion, the amount of the Gillette loans should be paid by Mr. Bernstein, and, while we may not legally collect these amounts from him, we feel that he owes a moral obligation to the bank which he should recognize, especially in view of the fact that he has profited immensely by these transactions.
 

 “On account of the many mistakes we have made in the handling of this matter, and for which we apologize to the department, we would much prefer that you treat this letter as confidential, and for the following reason:
 

 “Your examiners have given you the above facts, and which we are glad to verify, and on account of the prominence of the party most involved, we hesitate to bring on an open breach if it can be avoided, although- we feel that, regardless ot personal friendships and feelings, our first duty is to the institution which we serve.”
 

 The foregoing letter was signed, by A. J. Ingersoll, P. P. .Keith, S. G. Sample, Abe Meyer, and A. J. Peavy. Smith did not sign it, but he was a party to its delivery to the Comptroller, and in every respect concurred in it, and worked to further its purpose.
 

 On December 18, 1920, the committee appointed to go to Washington, with the exception of Herman Loeb, departed for that city. Plaintiff was with them, as a member of the committee, but remained in utter ignorance of the letter of December 16th. When the committee reached Washington, Smith left the delegation to go to the Comptroller’s office for the purpose of making an engagement for the committee to call. The engagement was made, and the committee called at the appointed time. Certain other loans, concerning which the committee was sent to Washington, were taken up and discussed,' and then the Tex-La-Homa matter was called for consideration. At this point in the discussion the Comptroller, concerning which there is no dispute, was called aside, and in confidence handed the letter of December 16th. He read the letter, and he and the member of the committee who handed it to him discussed its contents for a while. During the discussion, Smith was called over to the Comptroller, and was ques
 
 *57
 
 tioned concerning the contents of the letter; plaintiff, in the meantime remaining ignorant of what was being communicated to that official. The Comptroller then took up the Tex-La-Homa matter for discussion. After that matter had been discussed for a while, that official expressed the view that plaintiff was liable for the Tex-La-Homa and certain other loans of a kindred nature. XTaintiff desired to continue the discussion, but, as the Comptroller had an engagement with others, he referred plaintiff to a deputy. The discussion was resumed with one of the deputies, but without success.
 

 When the committee left Washington for home, plaintiff had no knowledge of the letter of December 16th or, for that matter, of the letter delivered in confidence by Smith to the Comptroller on September 21st. The party on their return were friendly, ate together, and some of the members of the committee expressed to Bernstein their regret because of the fate' with which he had met.
 

 After the committee reached Shreveport, Smith, if not also other members of it, expressed the view to Bernstein that he ought to guarantee the payment of the Tex-LaHoma loan, and later Smith advised plaintiff that, if he did not,. he thought that he would be prosecuted both civilly and criminally.
 

 About February 21, 1921, Smith telephoned plaintiff that he wished to see him at his office in the bank. When plaintiff reached the office, Smith was in conversation with a man, whose name the record does not disclose. Smith told plaintiff that this man wished to see him. In the conversation that ensued between this man and plaintiff the former advised the latter that he was a special- agent of the government, sent to investigate plaintiff’s connection with the bank, and gave him to understand, before the close ■of the conversation, that, unless he arranged the Tex-La-Homa loan satisfactorily with the bank, the result would be disastrous to him.
 

 This bit of evidence would seem incredible were it not for a letter, written by Smith to plaintiff, while this so-called government agent was working on Bernstein. The letter advised plaintiff fully what Smith thought plaintiff should do in the matter, and reads, in part, as follows:
 

 “From information received, I am positive that the agent now here is looking into the matter referred to in the Comptroller’s letter, which you have read. * * *
 

 “If you remember the paragraph in the letter from the Comptroller’s office, you can ‘read between the lines.’ While our directors say very little at our board meetings, there is a general feeling among them that you should look after the matter, and I believe this action on your part will do much to clarify the atmosphere. * * *
 

 “I am writing this letter as much in your interest as in the interest of the bank. I want you to think it over carefully, and no one but Mrs. Eaton and myself will know that this letter has gone out of the office. If a letter comes from you to me voluntarily giving this security, and also your written opinion on the chances of collection of these amounts, it will do away -with a feeling which has not existed since the days of the Rogers deal.”
 

 On the day that the guaranty, which plaintiff seeks to annul, was signed, or on the day following, Smith, in -conversation with the cashier of the bank, relative to the signing of the instrument, said that he had Bernstein badly frightened, and referred to the man mentioned above as having had a part in frightening him. This witness also -testified that Smith told him to get $300, and charge it as attorney’s fees, and that, to the'best of his recollection, Smith said the bank should do something for this man. A slip was made out for the amount, but the cashier demurred at approving it, for the reason it did not appear to whom the money was going. Smith, however, approved the slip. The slip was later filed in evidence,' -and -sup-; ports, as far as it. goes, the evidence of the-cashier. Our-.conclusion is that, defendants,
 
 *59
 
 through Smith,-employed this man to frighten plaintiff into signing the guaranty, and that the man was not a government agent.
 

 AVith .the foregoing pressure brought to bear on plaintiff by means, in so "far as the defendants herein are concerned, of deception and threats, plaintiff executed the guaranty, which he is here seeking to annul, and delivered it to the board, in session convened, for $70,000, the amount of the balance of the Tex-La-Homa loan then due, stating to tlie board at the same time that he was under no legal- or moral obligation to execute it. The board passed a resolution accepting the guaranty," and thanking plaintiff.
 

 AVhen plaintiff executed this guaranty he knew nothing of the letters of September 21 and December 16, 1920, nor of the deception that had been practiced to obtain it. However, some months later, Smith, after retiring from the presidency of the hank, wrote a pamphlet in vindication of his administration of the bank, and sent copies of it to the bank’s stockholders, lie published in this pamphlet the letter of December 16, 1920, which had been returned to him by the Comptroller at the close cff the interview at AVashington. Bernstein, for the first time, saw the letter in February, 1922, which was very shortly after the pamphlet had been published. This suit followed in August, 1922.
 

 Plaintiff contends that his demand for damages for the alleged libel is based, not only upon the writing and delivery of the letter of December 16, 1920, to the Comptroller, but also upon the publication of that letter in the pamphlet. AVhile the publication of the pamphlet is alleged in the petition, and a copy of it is attached thereto, yet an analysis of the allegations of the petition and of the prayer thereof clearly shows, we think, that the demand for damages is based on the writing and delivery of the letter to the Comptroller-; the allegation as to the publication of the pamphlet serving merely to show malice, and this- demand w.ill be so considered.
 

 The controlling feature of the letter of December 16, 1920, in so far as the letter may be libelous, is the paragraph that reads:
 

 “In our opinion, Hr. Bernstein has profited by making these loans, and we do not believe that he would have approved of such advances had they been strictly a banking matter, and presented to him through regular business channels, and we believe he .was influenced in making them by the interest lie had in the sales and purchases of the Gillette properties.”
 

 All that precedes or follows this paragraph may be said to be merely explanatory of the charge and written to show upon what it is based. v
 

 The Tex-La-Homa loan .of $100,000 was based upon what seemed to be ample security. The indorsers were mostly men of means, and were favorably recommended as credit risks by the commercial agencies and by the banks, and together, according to the reports, were worth many times the- amount of the loan. These reports were on file in the bank, when the loan was made, and, as we appreciate the evidence, remained in the bank’s files, save from time to time, when plaintiff needed them, and removed them temporarily to his desk, and, on the trip to AVashington,' took them with him. In addition to the indorsements on the note, the loan was secured, as we have observed, by a part of the oil run from the Tex-La-Homa’s properties. The loan appears to have been regularly made. It was approve^ by a committee before it was made, and later, even without criticism, approved by the board of directors. The loan does not appear to have been in excess of the amount which the bank was permitted to loan to any one person or corporation. AVith respect to the other loans referred to in the-letter, they appear to- have been regularly made. -
 

 The record does not show that' plaintiff profited, in any illegal or immoral sense,
 
 *61
 
 which the letter implies, by. making these loans, or was influenced- in making .them by any. interests which he had. We say this appreciating that plaintiff .was a large stockholder in the Mohawk Oil Company; that the company was a creditor of, and a stockholder in, the Tex-La-Homa Oil Corporation; that the Mohawk Oil Company received dividends from the Tex-La-Homa Oil Corporation, and that plaintiff, in turn, received dividends from the Mohawk Oil Company. However, the loan made to the Tex-La-Homa Oil Corporation, after having been placed to the credit .of that company, was used immediately to pay the Strange Oil Company an installment due on the- purchase price of the property acquired by the Tex-La-Homa Oil Corporation from the Strange Oil Company; this being the purpose for which the loan was made. We also appreciate, in making the foregoing statement, that plaintiff was a stockholder in the Paramount Petroleum Company, and in the Shreveport Producing & Refining Company, and was an officer of one of these companies when the loans to them were authorized and voted on by him, and that he possibly received dividends from time to time from these companies. However, as the bank that made the loans was a national bank, the manner of making them is governed by the laws of the United States, and we know of nothing in those laws, and hold that there is nothing in them, which prevents a director or officer of a national bank from authorizing- or voting on a loan merely because he is a stockholder in the corporation applying for the loan. Hence to hold that an officer or director of a bank had profited by a loan authorized or voted on by him, made to a corporation in which he was a stockholder, because, after making the loan, he had received dividends on his stock, would be, in effect, to hold that he could not authorize or vote on such a loan, which we do not consider to be the law.' We also ap-predate, in making the' foregoing statement to the effect- that it does not appear that plaintiff was influenced by his interests in making these loans or profited in any illegal or immoral sense in making them, that foreclosure proceedings were instituted against the Tex-La-Homa Oil- Corporation after these and the Gillette loans had been made. The proceedings were not instituted by plaintiff and Brown, as charged in the letter, but, which is. virtually the same, by the Mohawk Oil Company, and the property was bid in, not by plaintiff and-Brown, but by B. F. Roberts, and later transferred by- him-to the Woodbine Oil Company. These facts -have no tendency to show that plaintiff was, influenced by his interests in making these loans for the bank, or profited by the loans.. In our opinion, the charges of corruption, made by defendants against-plaintiff in the letter of December 16, 1920, forming the basis of the libel suit, are not true.
 

 Defendants urge, however, that the letter of December 16, 1920, was a privileged communication. There can be no question that a communication from the directors of a national bank to the Comptroller, relative to the affairs of the bank, is privileged. But it is only qualifiedly privileged, and, being only qualifiedly so, if it is not .made in good faith, but with actual malice, the-privilege is destroyed. 36 C. J. p.- 1241, § 205.- In this instance, the communication- was made maliciously. That it was so made is shown by the deception - practiced by defendant's on plaintiff in delivering it.
 

 In our view, the' communication is libelous, and plaintiff is entitled to judgment for tlie libel, unless his' demand'' for' damages-is barred by the prescription • of one year,' which defendants have pleaded. The: letter was delivered to the Comptroller on -December 20 or 21,' 1920. The suit was filed'' ob: August 8, 1922, and service of-citation was made a few months- later.-- Hence approxi
 
 *63
 
 mately 16 months intervened between the publication of the libel and the service of citation. ■
 

 The law provides that demands for damages for injurious words, whether verbal or written, are prescribed in one year, Civil Code, art. 3536. • The law also provides that this prescription begins to run from the date the damage, or injury, caused by the words, was sustained. Civil Code, art. 3537. Here the injury or damage was sustained when the letter was delivered to the Comptroller. Hence plaintiff’s demand for damages for the libel is prescribed, unless prescription has been suspended.
 

 In our opinion, prescription was suspended by the fraud and deception practiced on plaintiff in delivering the letter. The purpose of this deception was to conceal from him that such a letter had been written and delivered, and its effect was to conceal from him his cause of action. The act by which the concealment was accomplished was, in its very nature, as effective as if the concealment had been accomplished by other acts done from day to day. Under these circumstances we think the course of prescription was suspended until the fraud was discovered. See Hyman v. Hibernia Bank & Trust Co., 71 So. 598, 139 La. 411. The fraud was discovered on February 22, 1922, when plaintiff learned of, and for the first time saw, the letter of December 16, 1920. Prescription, therefore, began to run from February 22, 1922. As the service of citation was made within one year from that date, the plea of prescription is not well founded.
 

 The bank, as we have seen, urges that it ought not to be held liable for the acts of its directors in writing and delivering the letter to the Comptroller, since these officials acted.in their individual capacities and not as directors. However, in our view, they were acting as directors of the bank in delivering the letter, and the bank is therefore liable.
 

 The next question is the quantum of damages that should be allowed. Plaintiff claims $500,000, and ' has offered evidence tending to show that he has suffered damages in that amount. Aside from plaintiff’s many business enterprises and connections, he was active vice president of a bank, and the effect of the delivery of the letter to the Comptroller was necessarily to injure him. While we . are not of the opinion that plaintiff is entitled to anything like the amount of damages he claims, yet we think h’e is entitled to substantial damages. In our view, he should be allowed damages in the sum of $5,000. ’
 

 We now reach the demand for the annulment of the guaranty. The guaranty was obtained by means of a fraudulent scheme and by threats of criminal prosecution. There were no grounds for a criminal prosecution, and, as there were none, these threats are sufficient to annul the guaranty. Civil Code, arts. 1856 and 1857.
 

 The bank has sued plaintiff in reconvention, in the event the guaranty is annulled, on two items of the indebtedness, mentioned herein, one of them being the Tex-LaHoma loan, and the other one of the items of the Gillette indebtedness. However, as we find that plaintiff is not liable on this indebtedness, the reconventional demand should be disallowed.
 

 There are two matters which, while they have not escaped our attention, yet have not been mentioned in this opinion. One of these matters is in reference to the retraction by Abe Meyer, one of the defendants herein, of the statements made in the letter of December 16th, after suit had been filed against him. This retraction was made in the form of a letter addressed to plaintiff. Defendants contend that plaintiff, because of the retraction, released Meyer from all damages flowing from the letter of December 16th; and they argue that, as joint tort-feasors are liable in solido, and that, as the re
 
 *65
 
 lease of one debtor in solido releases all others, they are released. It may be said, however, that the evidence does not show that plaintiff has released Meyer, and we have no right to presume that he has. The suit has been, and is still being, prosecuted against Meyer as well as against the other defendants. The second one of the matters referred to above is an exception of no cause of action filed by defendants against plaintiff’s demand for damages. This exception has been considered, but, in our view, is not well founded. The evidence does not enlarge the pleadings in any material respect, and the fact that we have found defendants liable on that evidence shows that, in our opinion, the petition discloses a cause of action.
 

 For the reasons assigned, it is ordered that the judgment appealed from be annulled and set aside; and it is now ordered, adjudged, and decreed that plaintiff have and recover judgment against defendants, in solido, for said sum of $5,000, with 5 per cent, per annum interest thereon from judicial demand until paid, and further judgment against said bank annulling said guaranty, and ordering it returned to plaintiff. It is further ordered that said bank’s reconventional demand be rejected, appellees to pay the costs.
 

 THOMPSON, J., concurs in decree annulling guaranty, but otherwise dissents.