YARRUT, Judge.
From a judgment dismissing Plaintiffs’ suit to recover $100,000.00 damages for an alleged slanderous remark made by Defendant regarding the mental condition of Plaintiff-wife, Plaintiffs have taken this appeal.
Mr. Gaillot claims $25,000.00 for damage to the name, fame and reputation of the community, and for the mortification and humiliation to him as head of the community.
Mrs. Gaillot claims $50,000.00 damages to her good name, fame and reputation, and $25,000.00 for her personal mortification and humiliation, alleging that she is widely known in the City of New Orleans, and is a student of the Holy Bible, and has authored several pamphlets explaining various passages thereof; that she has often been called upon to deliver lectures and speeches concerning Biblical teachings, and Defendant, who disagreed with her Biblical interpretations, succeeded in ruining her credibility as a Biblical author and lecturer; that she is 42 years of age, has lived in this City all her life; is the mother of three children; and has always enjoyed the esteem and confidence of her neighbors, and of many other good people in this City and State.
Defendant is a Roman Catholic Priest, and was Pastor of a Church in New Orleans, attended by Plaintiffs before Mrs. Gaillot’s excommunication for publicly advocating disobedience of the Diocesan Archbishop’s official order for the racial integration of the Catholic parochial schools.
The alleged slanderous remark was made by Defendant in Church as part of a sermon to his congregation of 40 parishioners during benediction services. There is some difference in the testimony whether Defendant said Mrs. Gaillot had been in a “mental” institution, or simply in an “institution.” However, this is immaterial since the record leaves no doubt that Defendant intended to warn his congregation that Mrs. Gaillot might not be mentally responsible, and should be ignored.
Defendant contends that he, as Pastor of his Church, and in obedience to the Church’s stand on integration of its parochial schools, had the right to oppose and challenge Mrs. Gaillot’s crusade against the Church and its hierarchy, with the qualified privilege of referring to, and criticizing, her in any reasonable and pertinent manner, short of questioning her moral character.
Defendant repeated in court the nature of his sermon, made the basis of Plaintiffs’ suit, as follows:
“It was the Twelfth Sunday after Pentecost and the Gospel was the Tenth Chapter of St. Luke, in which a certain lawyer comes to ask our Lord what he has to do in order to go to Heaven, and, of course, He tells them that they have to follow the Commandments. He said first one to love God and second one, like the first one, is to love your neighbor, and then he tried to justify himself and asked, who is our neighbor, and then I talked about charity for about six minutes; and then it was just before the day before registration, before the school crisis, and it seemed natural to fall into question of integration because we have more than fifty children in the project, all poor children going to the Catholic School. Now you see every Pastor is worried about his children but more so in our case because I pay for all fifty of them to go to the Catholic School, and I had heard that there was commotion amongst them about a movement in which they were not going to go to Catholic School. So I felt obligated to mention it be *517 cause I felt very sorry for the children. They wouldn’t have been able very likely to get into the public school because the area where they live is already overcrowded and they already have the two shifts. So prompted by that I went from the text of the Gospel into the problem at hand. You’re satisfied for the time being4 with this?”
When asked if he had mentioned Mrs. Gaillot by name, he testified:
“Well, again, the connection is quite evident. I was trying to direct my people into sending their children into school; in other words, in obeying our leader instead of the other side. I felt morally obligated to do so, and I also felt like it would be a good idea at the time to be precise enough. Now I said, whom are we going to follow. Are we going to follow our spiritual leader, who is the Archbishop, who is very capable and has proved it many, many a year, or are we going to follow Mrs. Gaillot who, according to what I hear, has been in an institution.”
There is no evidence that Mrs. Gaillot was ever in a mental institution. However, when cross-examined and asked if she knew of any factual basis for Defendant’s statement that she had been in a mental institution, answered:
“A. I can’t answer that ‘no’ because some years ago, perhaps two years ago, Monsignor Plauche once suggested, because I would not listen to them without conclusive proof from the Scripture, that I should visit a psychiatrist. I said, ‘All right, Monsignor, if you pay for it and I pick psychiatrist I’ll gladly agree.’ That is the only incident.”
Further, she gave this significant answer when asked if she had ever contacted Defendant for an explanation of his remark:
“A. It was the Thursday after the Sunday that he had his sermon. Mr. Fruge had told me about the sermon and I had, I can’t name the calls asking me what institution that I was in. So I telephoned Father and I did not give my name because he did not ask it, but I asked for the Pastor, Father Sauvageau, and he said ‘speaking!’ and I told him that I was glad to hear that Mrs. Gaillot was in a mental institution. I said remember you said it during your services. He said ‘yes!’ but he did get it from reliable sources that I was in an institution twice. I said what institutions? We are interested. He said he didn’t know, but he did get it from reliable sources and he said in fact she’s ready to go back the third time. I said ‘really’; how can you tell! He said ‘just look at her on TV, and that’s all.’ I’d like to make it clear Father did not know it was me on the telephone.”
Mrs. Gaillot was engaged in a widespread campaign exhorting her listeners to disobey the Archbishop’s order to integrate the Catholic schools, made repeated radio addresses, was featured in television newscasts, and gave newspaper interviews.
Since Mrs. Gaillot was challenging her church and defying its ecclesiastical orders, the Defendant, as a Priest of the Church, and necessarily involved in the controversy with Mrs. Gaillot, had the right in good faith to warn his parishioners of Mrs. Gaillot’s possible mental incapacity.
In the case of Toomer v. Breaux, La. App., 146 So.2d 723, the court clearly expounded the law of qualified privilege, viz.:
“In other more numerous instances, a publication enjoys a ‘qualified’ or conditional privilege, applicable if the communication is made (a) in good faith, (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty. *518 (c) to a person having a corresponding interest or duty. This privilege arises from the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate.”
This privilege has been extended to include a moral duty. Walsh v. Bertel, 187 La. 877, 175 So. 605; Bernstein v. Commercial Nat. Bank, 161 La. 38, 108 So. 117; Oakes v. Walther, 179 La. 365, 154 So. 26; Leonard v. Wilson, 150 Fla. 503, 8 So.2d 12; 53 C.J.S. Libel and Slander § 89, p. 143.
Words, even though ordinarily slanderous, are not so considered when spoken by a party in the performance of a public or official duty, upon a first occasion and without malice. Mayo v. Sample, 18 Iowa 306; 6 La.Law Rev. 417.
When a communication is held to be privileged and based upon facts reasonably believed to be true, malice is not presumed.
Defendant and his Church had a mutual interest in the preservation of respect for, and obedience to, the ecclesiastical edicts of their governing authority; with the qualified privilege to refute and negate the efforts of anyone publicly challenging its orders and teachings, short of expressly or impliedly charging personal immorality or criminality.
Brewer v. Second Baptist Church of Los Angeles, 32 Cal.2d 791, 197 P.2d 713, held:
“Ordinarily, the common interest of the members of a church in church matters is sufficient to give rise to a qualified privilege to communications between members on subjects relating to the church’s interest.” Stewart v. Ging, 64 N.M. 270, 327 P.2d 333; Browning v. Gomez, Tex.Civ.App., 332 S.W.2d 588; Herndon v. Melton, 249 N.C. 217, 105 S.E.2d 531; Vickers v. Stoneman, 73 Mich. 419, 41 N.W. 495; Gately on Libel and Slander, 5th Ed. 1960, p. 227.
In our own jurisprudence, we find the case of Madison v. Bolton, 234 La. 997, 102 So.2d 433, where the rule regarding malice in such matters was stated as follows:
“[I]t falls within the class of qualified privileged communications where the occasion on which it was made rebuts the inference prima facie arising from a statement prejudicial to the character or reputation of plaintiff, and puts the burden on him to prove that there was malice in fact, that the defendant was actuated by motives of personal spite or ill will, independent of the occasion on which the communication was made.” Berot v. Porte, 144 La. 805, 81 So. 323, 3 A.L.R. 1651.
In Flanagan v. Nicholson Pub. Co., 137 La. 588, 68 So. 964, the court held that, where plaintiff, a resident of New Orleans, and an international vice-president of a labor union, used his influence at Washington to aid San Francisco to secure the Panama Fair as against New Orleans, which contest attracted great public interest in New Orleans and in the State, severe comment on such acts, which included a designation of plaintiff as traitor, by a New Orleans newspaper, was privileged as comment on a news matter of general public interest and on the acts of one who had in that connection made himself a public figure subject to such attack.
Objection was made to the admission of the telegram Mrs. Gaillot sent to the Archbishop to the effect she would not bring her intended suit if he would publicly debate the issue with her. The basis of the objection is that evidence of ineffectual efforts to compromise litigation is not admissible. The evidence of the telegram was brought out without objection when Mrs. *519 Gaillot was asked if her purpose in filing suit was to get money. She answered:
“A. No, Sir, and money has never been my goal, as you can well see.
‡ ‡ ‡ ‡ ‡
“A. Yes. It was my feeling that if we could have discussed the Scriptures I would not have brought this case to Court * * * ”
This compromise offer was not made to Defendant, but to a third party; and reveals that Mrs. Gaillot was not seeking retraction, but the widespread publicity she would get in a public debate with the Archbishop.
It is not within the province of this Court to determine whether or not Mrs. Gaillot was correct in disagreeing with her Church’s legal racial integration of its parochial schools. However, once she embarked upon a widespread public campaign encouraging revolt against the Church, she subjected herself to any pertinent criticism from the Church officials, short of charging her with personal or criminal immorality, under the rule of qualified privilege.
For the above and foregoing reasons, the judgment of the District Court is affirmed; Plaintiffs to pay costs in both courts.
Affirmed.